IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| LORETTA B. MEALY, Individually and as Executor of the Estate of Terrence L. Mealy,<br><br>    Plaintiff,<br><br>vs.<br><br>RIVER VALLEY BANCORP, INC.; FEDERAL DEPOSIT INSURANCE CORPORATION; and LARRY C. HENSON,<br><br>    Defendants. | **No. 3:14-cv-00091 – JEG**<br><br>**O R D E R** |

Before the Court is a Motion to Remand pursuant to 12 U.S.C. § 1819(b)(2)(D) and 28 U.S.C. § 1447(c) filed by Plaintiff Loretta B. Mealy (Loretta or Plaintiff) and a Motion to Stay Pending the Exhaustion of Administrative Remedies pursuant to 12 U.S.C. § 1821(d)(3)(B) filed by Defendant Federal Deposit Insurance Corporation (FDIC). Both motions are resisted. The Court conducted a hearing on the motions on October 7, 2014. Representing Plaintiff was attorney Mark Roberts; representing the FDIC were attorneys Angela Morales and Jesse Linebaugh; and present observing on behalf of Defendant Larry Henson was attorney Jonathan Gallagher. The motions are fully submitted and ready for disposition.

## I.     BACKGROUND

On March 20, 2014, Loretta Mealy, the surviving spouse of Terrence L. Mealy (Terrence) (collectively, the Mealys) and the executor of the Estate of Terrence L. Mealy (the Estate), which is being administered in the Iowa District Court for Muscatine County, filed this action in Iowa District Court for Scott County against River Valley Bancorp, Inc. (RVB), an Iowa bank holding company; Valley Bank, an Illinois state chartered bank; and Iowa resident Larry C. Henson (Henson), Chairman/Director and CEO of RVB and of Valley Bank (collectively, Defendants).

## A. Facts as Alleged in the Petition[1]

The Petition alleges that the Mealys maintained accounts, lines of credit, and loans at Valley Bank and that Valley Bank provided the Mealys with commercial and consumer loan and investment advice. Terrence formed a personal relationship with Henson, confided and trusted in Henson, relied on Henson's advice, and frequently met with Henson to discuss Terrence's activities at Valley Bank. During this personal relationship between Terrence and Henson, fiduciary relationships were formed with Defendants. After Terrence's death, Henson continued to advise Loretta and the Mealys' son, Patrick Mealy (Patrick); Patrick assisted Loretta with the Estate matters. As part of the fiduciary relationship that had formed between Terrence and Defendants, Defendants provided investment advice to Terrence and then to the Estate and induced investments from Terrence and/or the Estate in various entities and investments. Defendants had indirect and/or direct interest in some of the entities and/or investments in which they recommended that Terrence and/or the Estate participate. Defendants provided investment advice to Terrence and/or the Estate using their fiduciary relationship with him/it to encourage him/it to invest in entities and/or investments, upon which advice Terrence and/or the Estate relied to his/its detriment.

### 1. July 2012 Offering

The Petition alleges that in July 2012, Loretta and the Estate were joint owners of 8053 shares of RVB stock. Henson met with Loretta to discuss a private offering of RVB stock, and on July 5 and July 12, 2012, based upon those discussions, Loretta signed letters prepared by Valley Bank for the purchase of 714 and 2480 shares of RVB stock, respectively. The July 5 and July 12 letters were not subscription agreements. Henson delivered a memorandum to Loretta on July 12 (the July 12 Memo), which, according to Plaintiff, did not disclose several

---

[1] The facts alleged in Plaintiff's Petition filed in state court are assumed true for the purposes of these motions only.

facts and contained misrepresentations about the actual value of RVB, Valley Bank's performance, and other material facts known to the Defendants that adversely affected the value of RVB. The first page of the July 12 Memo stated the purchase price of the stock was $140 per share, but page 13 of the July 12 Memo stated that the current estimated tangible book value and offering price per share would be between $119 and $125 per share to be confirmed one month prior to the closing of the offering. On December 31, 2011, the tangible book value of the RVB common stock shares was $56.07. The terms of disclosures RVB filed with the SEC indicated that any sales connected to the July 2012 Offering had to be closed between August 31, 2012, and August 30, 2013.

According to Loretta, she was not provided any other memorandum relating to the private offering, notified of a proposed adjusted final offering price per share as contemplated in the July 12 Memo, advised by Defendants as to when the closing was contemplated to occur, nor informed that the final offering price of the stock in the July 2012 Offering had been adjusted as required by the July 12 Memo. Loretta alleges she never received the subscription agreement referencing the July 12 Memo, never executed the subscription agreement, never authorized the requisite payment of 20 percent of the subscription price and demand note for the balance of the subscription, never authorized payment for the stock, never received notification that the minimum of new capital subscriptions had been received by RVB, never received a request for a promissory note as contemplated by the July 12 Memo, and never received notice that a closing on the purchase of stock was contemplated.

Plaintiff alleges that in the course of the Mealys' long-standing relationship with Valley Bank as depositors and borrowers, Valley Bank applied Loretta's funds, which were in its possession from unrelated transactions, toward the sale of the RVB stock. Based on RVB's oral and written assurances, it was Loretta's understanding that a subscription agreement and final placement memorandum would be sent and that no purchase of the RVB stock would be

consummated until she received that final placement memorandum and executed the subscription agreement. Those assurances notwithstanding, Loretta denies that any subscription agreement or any other confirmation of closing and transfer of the stock was ever produced. Loretta also denies ever receiving stock certificates or other proof of ownership of new shares; rather, she alleges that it was after an inquiry by Patrick that she discovered the Mealys' total number of RVB shares was 19,742, an increase of 9285 shares, which Defendants contend Loretta purchased following the July 2012 Memo. Valley Bank refused to return Loretta's funds totaling $1,299,900 pertaining to the July 2012 Offering.

### 2. MidwestOne Shares

The Petition further alleges that in the fall of 2012, after the July 2012 Offering, Henson informed Patrick that MidwestOne Bank owned and was trying to sell 2400 shares of RVB stock, that MidwestOne's offer was interfering with the 2012 Offering that was underway, and asked if the Estate would be willing to purchase MidwestOne's shares of RVB stock on the same terms as in the July 12 Memo but at $88.50 per share. Plaintiff alleges that in reliance upon Henson's false and misleading representations, Loretta wrote a check to Valley Bank for $212,774 for the purchase of 2404 shares of RVB stock that MidwestOne was selling. Loretta never executed a subscription agreement, promissory note, nor received any stock certificates or other proof of ownership of the MidwestOne shares.

### 3. The Peters Loans

The Petition further alleges that real estate broker Fernando Peters (Peters) did business with Valley Bank brokering real property mortgages owned by Peters or other third parties that were located in New Jersey and elsewhere. On August 13, 2004, Valley Bank obtained from Terrence a $750,000 guaranty in favor of Valley Bank that guaranteed Peters' debts. According to Plaintiff, Valley Bank funded loans brokered by Peters for which Peters and/or the other borrowers might not otherwise have qualified to receive, and Defendants induced Terrence to

fund those loans with his own money, through loans, lines of credit, or as guarantor, to enable Valley Bank to loan the money directly to the borrowers, while representing to Terrence that those loans were secured by first mortgages on valuable real property. Plaintiff asserts that Defendants facilitated the Peters loans, assumed a duty to monitor the Peters loans, had more familiarity with the operative facts of those loans, had superior knowledge over Terrence to investigate the creditworthiness of Peters and the other borrowers, and owed a duty to disclose this information to Terrence. According to Plaintiff, Defendants omitted key information about the Peters loans to induce Terrence to fund them, failed to make diligent inquiry about the Peters loans prior to funding and permitting Terrence to fund/guarantee the Peters loans, and allowed Terrence to charge a fee on some of the Peters loans' transactions.

Plaintiff contends that the Peters loans failed to perform and were in default, and that although represented to Terrence to be first mortgages, the Peters loans were in fact junior mortgages, and further, that the real property securing the Peters loans was not as valuable as represented to Terrence. Plaintiff further contends that Valley Bank foreclosed on securities and attempted to foreclose on the Peters loans; Valley Bank and Peters were defendants in fore-closure actions by other lenders where Valley Bank's and/or Peters' interest was a junior mortgagee; Valley Bank failed to account to Terrence for money received on the Peters loans from the loans performance, foreclosure, and/or settlement; Valley Bank improperly charged Plaintiff's accounts for losses on the Peters loans; and that Defendants, knowing Terrence trusted and relied on Defendants' advice, exploited their fiduciary relationship in causing Terrence to fund loans without Valley Bank risking its own exposure to sub-standard loan applicants.

### B. Procedural History

The Petition alleges Henson was acting within the scope of his duties as employee, officer, and director of RVB and/or Valley Bank, that RVB and Valley Bank are liable for Henson's acts under the doctrine of respondeat superior, and that Defendants' actions are the proximate cause

of Plaintiff's damage. Plaintiff alleges causes of action for rescission, conversion, fraudulent inducement, violation of Iowa Code § 502.509(2), negligence and negligent supervision, breach of fiduciary duties, fraudulent misrepresentation, fraudulent nondisclosure, and declaratory judgment. Plaintiff also requests an accounting. Plaintiff requests costs of this action; and in Counts III, IV, V, VII, VIII, IX, Plaintiff requests compensatory and punitive damages.

RVB and Valley Bank accepted service on April 4, 2014, and filed answers and affirmative defenses on May 23, 2014. Henson accepted service on April 2, 2014, filed a pro se answer on April 18, 2014, and was thereafter granted an extension of time to file an amended answer. On June 10, 2014, under representation of counsel, Henson filed an amended answer and affirmative defenses.

On June 20, 2014, the Illinois Department of Financial and Professional Regulation – Division of Banking appointed the FDIC as receiver for Valley Bank; as such, the FDIC succeeded to all rights of Valley Bank and stands in the shoes of Valley Bank. On July 29, 2014, the FDIC filed a Notice of Substitution of Party in the state court action. On July 30, the FDIC filed a notice of removal alleging jurisdiction under 12 U.S.C. § 1819(b)(2)(B).

On August 13, 2014, the FDIC filed a Motion to Stay Pending the Exhaustion of Administrative Remedies arguing a stay was mandated by § 1821(d)(3)(B). Also on August 13, Plaintiff filed a Motion to Remand arguing the state law exception under § 1819(b)(2)(B)(i)-(iii) applies, and this Court lacks subject matter jurisdiction.

## II.    DISCUSSION

### A. Motion to Remand

Plaintiff argues this action must be remanded because all rights and obligations at issue in this action accrued before June 20, 2014, and thus involves only pre-closing rights against Valley Bank, or pre-closing obligations Valley Bank owed to depositors, creditors, or stockholders. Citing Empire State Bank v. Citizens State Bank, Plaintiff asserts that "remand is inappropriate

by virtue of subpart three of that section only where the court must decide a 'disputable issue of federal law.'" Empire State Bank v. Citizens State Bank, 932 F.2d 1250, 1252 (8th Cir. 1991) (quoting Perini Corp. v. FDIC, 754 F. Supp. 235, 238 (D. Mass.1991)). Plaintiff contends that only interpretation of Iowa law is necessary since there are no claims, defenses, or counterclaims based upon, or raising any, questions of federal law and that the FDIC has not raised any questions of federal law beyond its assertion that the action should be deemed to arise under the laws of the United States pursuant to § 1819. Plaintiff reasons that all three requirements of § 1819(b)(2)(D)(i)-(iii) are met, thus there is no federal question jurisdiction; and because complete diversity is lacking, there is also no diversity of citizenship jurisdiction under 28 U.S.C. § 1332. Plaintiff further asserts that pursuant to 28 U.S.C. § 1447(c), she is entitled to costs, expenses, and attorney fees incurred in prosecuting this motion because the FDIC improperly removed this case.

The FDIC resists the motion to remand arguing the state law exception under § 1819(b)(2) (D) does not apply. Citing Reding v. FDIC, 942 F.2d 1254, 1258 (8th Cir. 1991), the FDIC contends that remand is improper both because it has raised numerous colorable federal defenses and under the D'Oench, Duhme[2] Doctrine.

### 1. Standard for Motion to Remand

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441. "[The removing party] bears the burden of establishing that the district court had original jurisdiction by a preponderance of the evidence. All doubts about federal jurisdiction should be resolved in favor of remand to state court." Knudson v. Sys. Painters, Inc., 634 F.3d 968, 975 (8th Cir. 2011) (internal citation and quotation marks omitted).

---

[2] D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942).

"It is axiomatic the court's jurisdiction is measured either at the time the action is commenced or, more pertinent to this case, at the time of removal." Schubert v. Auto Owners Ins. Co., 649 F.3d 817, 822 (8th Cir. 2011).

## 2. Section 1819(b)(2)(B) – FDIC Corporate Powers State Law Exception

The FDIC corporate powers provision, § 1819(b)(2)(B), under which the FDIC removed this case, in relevant part, provides as follows:

> *Except as provided in subparagraph (D)*, the [FDIC] may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the [FDIC] or the [FDIC] is substituted as a party.

(emphasis added).

Paragraph D, "the state law exception," in turn, provides the following:

> (D) State actions:
> Except as provided in subparagraph (E), any action–
> (i) to which the [FDIC], in the [FDIC]'s capacity as receiver of a State insured depository institution by the exclusive appointment by State authorities, is a party other than as a plaintiff;
> (ii) which involves only the preclosing rights against the State insured depository institution, or obligations owing to, depositors, creditors, or stockholders by the State insured depository institution; and
> (iii) in which only the interpretation of the law of such State is necessary, shall not be deemed to arise under the laws of the United States.

Id. § 1819 (b)(2)(D)(i)-(iii).

Plaintiff asserts, and the FDIC does not dispute, that the first two requirements of the state law exception have been met in this case: (1) the FDIC is not a plaintiff in this action, and (2) the causes of action only affect the preclosing rights of Valley Bank in whose shoes the FDIC stepped. Plaintiff argues that the third requirement is also met because the Petition only raises claims based upon Iowa law, and there are no claims or counterclaims arising under the Constitution, laws, or treaties of the United States.

8

The FDIC argues that contrary to Plaintiff's assertion, this action does not depend solely on the interpretation of Iowa law because the FDIC has various colorable federal defenses to Plaintiff's claims and requests for relief. The FDIC asserts that Plaintiff's request for punitive damages, attorney fees, and other equitable relief are barred by federal statute, which requires interpretation of federal law. The FDIC posits that it need only raise a "disputable issue of federal law" to defeat Plaintiff's motion to remand and that this Court is prohibited from assessing the merits of the defense and must only determine whether the FDIC's federal defense raises "a colorable issue for decision and is not meritless." Reding, 942 F.2d at 1257.

Plaintiff counters that the FDIC has done nothing more than *assert* defenses based on federal law, which, under Reding, is not enough to defeat the state law exception. Reding does not support Plaintiff's contention.

In Reding, the Eighth Circuit first distinguished that the "well-pleaded complaint" rule does not control the interpretation of section § 1819(b)(2)(D)(iii).

> We hold that section 1819 establishes a rebuttable presumption that the FDIC may properly remove any case in which it is a party, and that federal jurisdiction is proper unless the opposing party can prove that the three exceptions in section 1819(b)(2)(D) are applicable. When the party opposing the FDIC relies on the "state law" exception of section 1819(b)(2)(D)(iii) and argues that only issues of state law are present, the exception is not met if the FDIC seeks to rely on a defense raising a disputable issue of federal law. The FDIC, however, cannot automatically defeat the exception in subpart (iii) by merely *asserting* a defense based on federal law because such a rule would completely eviscerate the exception. For the state law exception to apply, the district court must find that the FDIC's defense does not genuinely raise a disputable issue under federal law. The district court should not make a determination upon the merits of the defense. To uphold the presumption of federal jurisdiction, the district court need find only that the FDIC's claimed federal defense presents a colorable issue for decision and is not meritless.

Id. at 1258 (footnote and citations omitted) (adopting the reasoning of the First Circuit in Capizzi v. FDIC, 937 F.2d 8, 10-11 (1st Cir. 1991), and the Eleventh Circuit in Lazuka v. FDIC, 931

F.2d 1530 (11th Cir. 1991), superseded by statue on other grounds, 12 U.S.C. § 1730(k)(1), as recognized in FDIC v. S&I 85-1, Ltd., 22 F.3d 1070, 1073 (11th Cir. 1994)).[3]

Reding does articulate that the state law exception will not be defeated merely upon the FDIC "*asserting* a defense based on federal law;" however, that language cannot be read in a vacuum and does not narrowly define "asserting" as requiring an affirmative defense previously referenced in a filed pleading rather than in response to a motion to remand.  See infra p. 11. The court goes on to pronounce that "[f]or the state law exception to apply, the district court must find that the FDIC's defense does not genuinely raise a disputable issue under federal law," but cautioned that "[t]he district court should not make a determination upon the merits of the defense."  Id.  Thus, contrary to Plaintiff's contention, the applicability of the state law exception does not turn on the manner or timing in which the FDIC asserts its federal law defense, but upon the court's finding whether the asserted defense genuinely raises a disputable issue of federal law.

The FDIC argues that its colorable defenses include that federal law precludes the award of punitive damages and attorney fees against the FDIC, which Plaintiff requests.  See, e.g., Diaz v. McAllen State Bank, 975 F.2d 1145, 1150 (5th Cir. 1992) (holding remand was improper

---

[3] In Capizzi, 937 F.2d at 10-11, the court reasoned that the language of § 1819(b)(2)(D)(iii) evidenced Congress' intent that courts look beyond the plaintiff's complaint to any defenses in order to determine if only state law issues are present and that the history and general purpose of § 1819 supported the conclusion that the well-pleaded complaint rule did not apply in these circumstances.  The court recognized that district courts must look to the defenses raised to determine what they are and their likely significance to the case.  Id. at 11.

In Lazuka, 931 F.2d at 1534-36, the court held that § 1819 created a "rebuttable pre-sumption" of federal jurisdiction for cases involving the FDIC and that amendments to that section show Congress' intent to nullify the well-pleaded complaint rule when interpreting the exception in subpart (iii) because in "deeming" actions to arise under federal law, Congress placed the burden of defeating federal jurisdiction on the plaintiff and eliminated the requirement that the basis for federal jurisdiction appear on the face of the plaintiff's complaint.  Thus, the Lazuka court concluded that "because the 'well-pleaded complaint' rule is inapplicable, the FDIC may raise a federal defense to rebut a plaintiff's showing that only interpretation of state law is necessary to the disposition of the case."  Id. at 1535.

because the third prong of § 1819 (b)(2)(D)'s state law exception did not apply reasoning, inter alia, that in addition to other defenses, the FDIC "may also have a colorable defense to the request for punitive damages in [the plaintiff]'s complaint," and thus the FDIC's "claimed federal defense[s] present[ed] a colorable issue for decision and [were] not meritless"); Holmes v. FDIC, No. 11-CV-211, 2011 WL 1750227, at *3 (E.D. Wis. May 6, 2011) (denying the plaintiff's motion to remand based upon the state law exception finding that the FDIC's assertion of five federal defenses that it might raise against the plaintiff's claims, which included that federal law prohibited awarding punitive and exemplary damages against FDIC, and that FIRREA prohibited awarding attorneys' fees and requiring an accounting against the FDIC, were colorable defenses, and thus defeated the state law exception); FDIC v. Beatley, No. 2:10-CV-00229, 2011 WL 665448, at *6 (S.D. Ohio Feb. 11, 2011) (denying counterclaim plaintiff's motion to remand finding the state law exception under § 1819 (b)(2)(D) did not apply because counterclaim defendant FDIC raised a number of colorable federal defenses including defendants' failure to exhaust administrative remedies and that federal law precluded the defendants' request for punitive damages), report and recommendation adopted sub nom. FDIC v. Beatley, 2:10-CV-00229, 2011 WL 839258 (S.D. Ohio Mar. 4, 2011).

In its Reply, Plaintiff argues that any alleged defense against punitive damages is premature and that to the extent such damages are barred by statute, Plaintiff shall not seek punitive damages. Pl.'s Reply 7-8, ECF No. 10-1. Plaintiff acknowledges that a complaint cannot be amended to deprive a court of jurisdiction if jurisdiction existed at the time of removal, see generally Thatcher v. Hanover Ins. Grp., Inc., 659 F.3d 1212, 1214 (8th Cir. 2011) ("[I]n a diversity action a plaintiff may not merely amend his complaint after removal to . . . deprive the federal court of jurisdiction." (citing St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 292, 294 (1938)), but nonetheless proposes that because punitive damages were requested against Valley Bank, which was subject to such damages and she could not have foreseen that a

11

party not subject to such damages would later be substituted for Valley Bank, Plaintiff should be allowed to withdraw its request for punitive damages. Plaintiff cites no authority that there is an exception in such circumstances. In fact, in the cited cases where punitive damages have defeated the state law exception, punitive damages were similarly sought against a party subject to such damages that was later substituted with the FDIC, therefore putting the present case on all fours those cases, see, e.g., Diaz, 975 F.2d at 1150; Holmes, 2011 WL 1750227, at *1; and Beatley, 2011 WL 665448, at *2. In addition, the Eighth Circuit has found that not only do claims asserted against the original party survive after substitution of that party by the FDIC, but they also survive a subsequent substitution of the FDIC with the party to whom the FDIC later sells its interest. See Dittmer Props., L.P. v. FDIC, 708 F.3d 1011, 1016-17 (8th Cir. 2013).

Regarding the FDIC's defense against attorney fees, Plaintiff cites Bank of the Ozarks v. Arco Community Outreach Coalition, Inc., No. CV212-017, 2012 WL 2673246 (S.D. Ga. July 5, 2012), and argues that courts have not found § 1825[4] bars requests for attorney fees in cases, such as the present, in which attorney fees are sought pursuant to a state law that is not penal in nature. This argument also misses the mark.

Although in Bank of the Ozarks, the magistrate judge denied a motion to strike a claim for attorney fees reasoning § 1825(b)(3) did not bar such an award, see id. at *3, the facts of that case, and more importantly, the posture of the parties in that case, render it inapplicable. In that case, Arco Community Outreach Coalition, Inc. (Arco) and an individual guarantor, John Ford, signed a note in favor of Oglethorpe Bank. Id. at *1. The FDIC became receiver of Oglethorpe Bank and then assigned the documents to Bank of the Ozarks. Id. Arco and Ford allegedly defaulted on the note, and Bank of Ozarks sued them to recover on the note and the guarantees.

---

[4] Section 1825(b)(3) states, "When acting as a receiver, . . . [t]he [FDIC] shall not be liable for any amounts in the nature of penalties or fines, including those arising from the failure of any person to pay any real property, personal property, probate, or recording tax or any recording or filing fees when due."

Id.  Bank of the Ozarks moved to strike various defenses raised by Ford, who was acting pro se, including an entitlement to attorney fees under Georgia law, arguing such an award was penal in nature and thus precluded as against the FDIC under § 1825.  Id. at *3.  The court refused to strike the defense relying on federal cases that analyzed the relevant Georgia statute and found the award of expenses of litigation, including attorney fees, was not penal in nature.  Id.  Importantly, and not addressed by Plaintiff in its reliance on Bank of the Ozarks, is that the court added, "[i]t should be noted that 12 U.S.C. § 1825(b)(3) might not even apply to [p]laintiff in this context.  As the plaintiff in this action, [p]laintiff is acting for itself and has, with regard to its behavior as a litigant, removed its 'successor to the FDIC as receiver' hat."  Id. at *3 n.5.  Thus, Bank of the Ozarks is unhelpful to Plaintiff's position.

Whether Plaintiff is entitled to recover its requested litigation costs and attorney fees from the FDIC appears to be a disputable issue of federal law and therefore is a colorable defense raised by the FDIC.

Plaintiff similarly cites cases for the proposition that the FDIC's stated defense against an accounting does not give rise to a disputable issue under federal law barring remand under the state law exception.[5]  However, as with the FDIC's federal defenses to Plaintiff's request for

_____

[5] Plaintiff discusses Dittmer Properties, 708 F.3d at 1016-17, and suggests that because the court held that a two-part test is required to *determine whether the equitable relief requested is barred* by § 1821(j), the FDIC's argument that § 1821(j) is a defense to Plaintiff's request for an accounting is not a colorable defense.  Plaintiff's asserted distinction is faulty.  On a motion to remand based on the state law exception under § 1819(b)(2)(D), the Court does not determine the merits of the defense raised by the FDIC; rather, the Court limits its determination to *whether the FDIC raises* a colorable federal defense.  A closer look at Dittmer's procedural posture supports, rather than distinguishes, the FDIC's position in the present case.

The Dittmer case started as a state court action that the FDIC removed once it had been appointed receiver; the plaintiff did not move to remand.  Id. at 1014-15 & n.2.  The FDIC filed a Rule 12(b)(1) motion to dismiss the plaintiff's equitable (injunctive) relief claim arguing it was barred by § 1821(j).  Id. at 1015.  While the motion to dismiss was pending, the FDIC sold the note at the core of the litigation to a third-party investor.  Id.  The district court granted the motion to dismiss.  Id.  On appeal, as a matter of first impression, the Eighth Circuit analyzed several cases from other jurisdictions having addressed the issue, distinguished the plaintiff's

punitive damages and attorney fees, the FDIC also raises a colorable federal defense against Plaintiff's request for an accounting.  See Holmes, 2011 WL 1750227, at *4 (analyzing the FDIC's argument that it would defend against the plaintiff's request for an accounting by pointing to § 1821(j), which provides "that [e]xcept as provided in this section, no court may take any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver," noting that various courts have held that § 1821(j) acts as a broad bar to equitable relief, and thus concluding the FDIC raised a colorable issue of federal law).  Plaintiff is critical of the Holmes court suggesting it "seems to wrongly allow the FDIC to simply assert any defense in contravention of Reding."  Pl.'s Reply 4 n.4, ECF No. 10-1.  However, the cases Plaintiff cites for the proposition that its request for an accounting is not *foreclosed* by § 1821(j) were not analyzed for purposes of determining whether the FDIC raised a colorable defense under federal law, but are all cases analyzing the *merits* of the FDIC's defense under § 1821(j) on *motions to dismiss*.  See, e.g., Heno v. FDIC, 996 F.2d 429, 431-32 (1st Cir. 1993) (reversing and remanding the district court's grant of a Rule 12(b)(1) motion to dismiss plaintiff's claims for equitable relief, which included an accounting), opinion withdrawn and superseded on reh'g, 20 F.3d 1204 (1st Cir. 1994).  Goldstein v. FDIC, CIV.A. ELH-11-1604, 2012 WL 1819294, at *13-15 (D. Md. May 16, 2012) (denying the FDIC's *motion to dismiss* the plaintiff's claim for an accounting reasoning that although an accounting is an equitable remedy, the FDIC had not provided authority for the proposition that an accounting "would restrain or affect the exercise of powers or functions of the FDIC within the meaning of § 1821(j)" and that

---

arguments, adopted a two-part test to determine whether the equitable relief requested was barred by § 1821(j), and concluded that under the facts of the case, the plaintiff's equitable relief was barred.  Id. at 1018-20 (affirming the grant of the defendant FDIC's motion to dismiss reasoning that the court must determine whether the "challenged action is within the receiver's power or function; if so, it then determines whether the action requested would indeed 'restrain or affect' those powers," and concluded that the challenged action in that case – enforcing the note against the signers and the ability to sell the mortgaged property – were unquestionably within the receiver's duties and powers).

based upon Maryland law regarding accounting claims, the allegations in the complaint were sufficient to state a claim" (internal quotation marks omitted)).  On a motion to remand, the Court is prohibited from assessing the merits of the defense and limits its determination to whether the FDIC's asserted federal defense raises "a colorable issue for decision and is not meritless."  Reding, 942 F.2d at 1257.

The FDIC has clearly asserted a colorable federal defense.

### 3.  **D'Oench, Duhme** Doctrine

The FDIC argues that in addition to colorable federal defenses that preclude the application of the state law exception, this case does not satisfy the third prong of § 1819 (b)(2)(D) because § 1823(e) and the D'Oench, Duhme Doctrine bar Plaintiff's claims based on alleged oral misrepresentations.  Plaintiff contends neither § 1823(e) nor the D'Oench, Duhme Doctrine apply because Plaintiff's claims do not depend on any agreements with the FDIC or Valley Bank, nor does Plaintiff allege a secret or side agreement, nor any agreement that was designed to deceive.

Section 1823(e) states,

(e)  Agreements against interests of Corporation
    (1) In general
        No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement--
        (A)  is in writing,
        (B)  was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
        (C)  was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
        (D)  has been, continuously, from the time of its execution, an official record of the depository institution.
    (2) Exemptions from contemporaneous execution requirement
        An agreement to provide for the lawful collateralization of–

(A) deposits of, or other credit extension by, a Federal, State, or local govern-
mental entity, or of any depositor referred to in section 1821(a)(2) of this
title, including an agreement to provide collateral in lieu of a surety bond;

(B) bankruptcy estate funds pursuant to section 345(b)(2) of Title 11;

(C) extensions of credit, including any overdraft, from a Federal reserve bank
or Federal home loan bank; or

(D) one or more qualified financial contracts, as defined in section 1821(e)
(8)(D) of this title, shall not be deemed invalid pursuant to paragraph (1)(B)
solely because such agreement was not executed contemporaneously with
the acquisition of the collateral or because of pledges, delivery, or substi-
tution of the collateral made in accordance with such agreement.

"Section 1823(e) generally is accepted as representing the codification of the rule from

D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942)." Empire State Bank, 932 F.2d at 1252-

53. In D'Oench, Duhme, "the Supreme Court held that when the maker of an instrument has

'"lent himself to a *scheme or arrangement* whereby the banking authority . . . was likely to be

misled," that scheme or arrangement could not be the basis for a defense against the FDIC.'" Id.

(quoting Langley v. FDIC, 484 U.S. 86, 92 (1987) (quoting D'Oench, 315 U.S. at 460 (alteration

in original))).

After Empire State Bank, the Eighth Circuit in Reding further discussed the applicability

of the FDIC's defense under § 1823(e) and the D'Oench, Duhme Doctrine raised against a plain-

tiff's motion to remand.

> There is strong authority supporting the FDIC's use of both section 1823(e) and
> D'Oench as defenses in cases in which plaintiffs seek to assert affirmative state law
> claims against the FDIC as receiver of a failed state bank arising from agreements which
> diminish the assets acquired by the FDIC. The debtors' claims arguably arise from
> extraneous agreements and clearly tend to diminish the assets acquired by the FDIC.
> Thus, the FDIC has raised a disputable issue of federal law regarding whether section
> 1823(e) and D'Oench apply to bar the debtors' claims and the case should be retained
> in the federal courts for decision on the merits.

Reding, 942 F.2d at 1259 (internal citations omitted).

While the impact of unwritten representations was diminished in Plaintiff's argument, the

Court notes Plaintiff's Petition is replete with alleged oral representations accompanying the

agreements, including allegations of misrepresentations in connection with the guaranty

Terrence provided Valley Bank in 2004 and alleged misrepresentations in connection with Plain-

tiff's purchase of the MidwestOne shares. See, e.g., Pet. ¶¶ 54-58, ECF No. 1-1 ("After the 2012

Offering, during the fall of 2012, Henson *informed* Patrick that MidwestOne Bank owned 2,400

shares of RVB stock that MidwestOne was trying to sell. Henson *informed* Patrick . . . . Henson

*inquired* if the Estate would be willing . . . . Henson *made false and misleading statements* to the

Estate and Loretta . . . . Relying on Henson's *false and misleading statements*, Loretta wrote a

check for $212,774 to [Valley] Bank . . . ." (emphasis added)).

    In <u>Langley</u>, the Supreme Court observed two purposes of § 1823(e) –

> One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities, see 12 U.S.C. §§ 1817(a)(2), 1820(b), and when the FDIC is deciding whether to liquidate a failed bank, see § 1821(d), or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank, see §§ 1823(c)(2), (c)(4)(A). The last kind of evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." <u>Gunter v. Hutcheson</u>, 674 F.2d, [862,] 865 [(11th Cir. 1982)]. Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

> A second purpose of § 1823(e) is implicit in its requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of the note and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure. Neither purpose can be adequately fulfilled if an element of a loan agreement so fundamental as a condition upon the obligation to repay is excluded from the meaning of "agreement."

<u>Langley</u>, 484 U.S. at 91-92. The <u>Langley</u> Court noted that in <u>D'Oench, Duhme</u>, the leading case

prior to the enactment of § 1823(e), the Court rejected the note maker's defense that a failed

promise was a condition precedent to note maker's performance, and "held that this 'secret

agreement' could not be a defense to suit by the FDIC because it would tend to deceive the banking authorities," reasoning that "the maker 'lent himself to a scheme or arrangement whereby the banking authority . . . was likely to be misled,' that scheme or arrangement could not be the basis for a defense against the FDIC."  Id. (alteration in original).  The <u>Langley</u> Court thus surmised,

> We can safely assume that Congress did not mean "agreement" in § 1823(e) to be interpreted so much more narrowly than its permissible meaning as to disserve the principle of the leading case applying that term to FDIC-acquired notes.  Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counter-promise (as in <u>D'Oench, Duhme</u>) or of the truthfulness of a warranted fact.

<u>Id.</u> at 92-93.

Plaintiff's arguments to the merits of a defense based upon § 1823(e) are completely beside the point.  In fact, Plaintiff does not rebut that the Petition contains multiple examples of oral representations that form the bases of her claims.  Instead the Plaintiff objects that her claims do not depend on any agreements with the FDIC or Valley Bank and that Plaintiff has alleged no secret or side agreement.  However, in paragraphs 86-88 of her Petition, Plaintiff alleges that Henson was acting within the scope of his duties as employee, officer, and director of RVB and/or Valley Bank, that RVB and Valley Bank were liable for Henson's acts under the doctrine of respondeat superior, and that Defendants' actions were the proximate cause of Plaintiff's damage.  Plaintiff cannot distance her claims from any conduct involving Valley Bank, while simultaneously holding Valley Bank responsible for that conduct.  Contrary to Plaintiff's assertion, her claims do, in fact, depend on agreements with Valley Bank.  See <u>Diaz</u>, 975 F.2d 1145, 1148-50 (5th Cir. 1992) (holding remand was improper because the third prong of § 1819 (b)(2)(D)'s state law exception did not apply reasoning plaintiff's claims in the litigation were based primarily on oral representation, agreements, or courses of dealing, and thus the FDIC's defenses to those claims were governed by the <u>D'Oench, Duhme</u> doctrine and § 1823(e), both of

which provide that agreements must be in writing to be enforced against the FDIC, that the FDIC "may also have a colorable defense to the request for punitive damages in [the plaintiff]'s complaint," and thus the FDIC's "claimed federal defense present[ed] a colorable issue for decision and [was] not meritless").

In addition to the other defenses previously discussed, the FDIC has raised a colorable federal defense under § 1823(e) and the <u>D'Oench, Duhme</u> Doctrine, thus providing additional support that the case should remain in federal court. <u>See</u> <u>Reding</u>, 942 F.2d at 1259 ("[T]he FDIC has raised a disputable issue of federal law regarding whether section 1823(e) and <u>D'Oench</u> apply to bar the debtors' claims and the case should be retained in the federal courts for decision on the merits.").

### 4. Attorney Fees and Costs

Upon the conclusion there was a proper basis for removal, the Court is denying Plaintiff's Motion to Remand, thus Plaintiff's request for costs and attorney fees related to this motion, based upon alleged improper removal, is moot.

## B. Motion to Stay

The FDIC moves to stay proceedings pending exhaustion of statutorily-mandated administrative remedies. Plaintiff argues the motion should be denied because the stay the FDIC requests could extend as long as eight months, which is inappropriate under the governing statute with respect to an action, such as this one, that was pending before the FDIC was appointed receiver.

### 1. Section 1821

The FDIC was appointed receiver on June 20, 2014, and on July 29, it filed a notice of substitution for Valley Bank in this case, noting that pursuant to § 1821(c) and (d), it succeeded

to all rights, titles, powers, and privileges of Valley Bank. Not. of Removal - Ex. 15, ECF No. 1. On July 30, 2014, the FDIC removed this action pursuant to § 1819.

Section 1821, titled "insurance funds," details various procedures and responsibilities to be performed following receivership appointment. Subsection (d) sets out twenty provisions regarding the powers and duties of the conservator or receiver, including its power to resolve outstanding claims against the institution on receivership, and accordingly encompasses the ability to determine claims. Provision (3)(B) of subsection (d) requires the receiver/conservator to "promptly publish a notice to the depository institution's creditors to present their claims, together with proof, to the receiver by a date specified in the notice which shall be not less than 90 days after the publication of such notice." 12 U.S.C. § 1821(d)(3)(B). Provisions (5)(A)-(F) of subsections (d) delineate the procedures for determining claims and provide, inter alia, that "[b]efore the end of the 180-day period beginning on the date any claim against a depository institution is filed with the Corporation as receiver, the Corporation shall determine whether to allow or disallow the claim and shall notify the claimant of any determination with respect to such claim." Id. § 1821(d)(5)(A)(i).

In the present case, in compliance with § 1821(d)(3)(B), the FDIC published notices to creditors and depositors of Valley Bank informing that Valley Bank was closed and that any claims against Valley Bank must be filed with the FDIC on or before September 24, 2014 (Claims Bar Date). Publ. Not., Mot. Stay - Ex. A, ECF No. 3-2. In addition, pursuant to § 1821 (d)(3)(C), the FDIC mailed claims notices to Plaintiff, which informed Plaintiff that her claims against Valley Bank were required to be filed by the Claims Bar Date and set out the procedures regarding the filing and determination of such claims. Though there had been no notice to the

Court, upon the Court's inquiry at the motion hearing, Plaintiff's counsel acknowledged that an

administrative claim had been filed with the FDIC before the Claims Bar Date.[6]

> Typically, exhaustion of administrative remedies is required where Congress imposes such a requirement. If the statutory language is not explicit, courts are guided by congressional intent in determining whether exhaustion is required. Although FIRREA does not explicitly mandate exhaustion of administrative remedies before judicial intervention, the language of the statute and indicated congressional intent make clear that such is required.

> Section 1821(d)(13)(D) operates to divest the courts of jurisdiction over certain actions against the [Resolution Trust Corporation (RTC)]. Section 1821(d)(6)(A) permits a claimant to file suit only after filing a claim with the RTC as receiver and then only if the receiver has disallowed the claim or the 180-day determination period has expired. At that point, the claimant may file suit in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located . . . (and such court *shall have jurisdiction to hear such claim*). FIRREA contains no provision granting federal jurisdiction to claims filed after a receiver is appointed but before administrative exhaustion. As such, section 1821(d)(13)(D) clearly establishes a statutory exhaustion requirement. Other courts have so held.

Meliezer v. Resolution Trust Co., 952 F.2d 879, 882 (5th Cir. 1992) (internal citations, quotation

marks, and footnotes omitted).

Citing Whatley v. Resolution Trust Corp., 32 F.3d 905, 910 (5th Cir. 1994), Plaintiff

argues the FDIC has no authority to request a stay of longer than 90 days noting that the statute

uses the permissive language "may" and that if Congress required a stay of all pending judicial

action, it would have used mandatory language.

The circumstances in Whatley are distinguishable from those of the present case as the

issue before that court was whether the district court had improvidently *dismissed* a case for

failure to exhaust administrative remedies. Id. at 907. The procedural posture notwithstanding,

---

[6] In the absence of an official notice, the Court does not assume the accuracy of the date of filing provided in response to the Court's question.

Whatley is instructive; but contrary to Plaintiff's contention, Whatley supports the FDIC's position in the present case.

The Whatley plaintiff filed a lawsuit in state court asserting various state tort claims against the defendant bank. Id. at 906. The RTC, as conservator for the bank, intervened, and removed the case to federal court. Id. After being substituted as defendant, the RTC requested and was granted a 45-day stay pursuant to § 1821(d)(12)(A)(i).[7] Id. Six months after the 45-day stay expired, the bank was declared insolvent, the RTC was named receiver and filed pleadings to reflect its capacity as receiver. Id. The RTC, however, did not request the 90-day stay permitted for receivers under § 1821(d)(12)(A)(i). Id. Additionally, although the RTC had initiated the administrative claims process by publishing notice for creditors of the insolvent bank to file claims, it did not publish notice in the county where the plaintiffs lived nor did it provide personal notice to the plaintiffs. Id. The plaintiffs, unaware of the procedure for filing an administrative claim, sent the RTC a letter advising it of their claims. Id. at 107. After the time for filing an administrative claim had passed, the RTC filed a motion to dismiss for failure to exhaust administrative remedies. Id. The plaintiffs resisted arguing (1) the FIRREA administrative claim process did not apply to lawsuits filed before the appointment of the receiver, (2) the receiver's failure to provide notification exempted the plaintiffs from the exhaustion requirement, and (3) the receiver had been notified by the plaintiffs' letter of their claim. Id. The district court ultimately granted the motion to dismiss finding the plaintiffs failure to file an administrative claim deprived the court of jurisdiction. Id.

---

[7] Section § 1821(d)(12)(A)(i) states, "After the appointment of a conservator or receiver for an insured depository institution, the conservator or receiver may request a stay for a period not to exceed--(i) *45 days, in the case of any conservator* and (ii) *90 days, in the case of any receiver*, in any judicial action or proceeding to which such institution is or becomes a party." (emphasis added).

On appeal, the court noted that although federal jurisdiction of pre-receivership claims continues after the appointment of a receiver, once appointed, the receiver *may* request a stay to institute the administrative process.  Id. at 908 (citing § 1821(d)(5)(F)(ii)).  In reversing the district court's dismissal of the action, the court held that

> with regard to actions filed before the receivership, the receiver may opt either for the judicial route, by allowing the action to continue, or it may choose the administrative process, by moving for a stay within 90 days of its appointment.  In the instant case, RTC did not timely request a stay of the plaintiffs' pre-receivership proceeding and it is therefore deemed to have determined to proceed with the litigation in federal court.

Id. at 910.  In the present case, the FDIC *did* move for a stay and thus opted for the administrative route.  Accordingly, while the Whatley court's account of the administrative process is instructive, that court's conclusion does not apply in to the present case.

Bueford v. Resolution Trust Corp., 991 F.2d 481, 483 (8th Cir. 1993), is not only instructive, but it is compelling authority.  In Bueford, after the plaintiff filed a discrimination lawsuit against the defendant bank, RTC was appointed receiver.  Id.  RTC notified the plaintiff's attorney of the receivership and informed that any claim against the bank must be submitted to RTC by the stated deadline pursuant to § 1821(d)(3).  Id.  Thereafter, RTC removed the case.  Id. Three months after the deadline to file a claim had passed, the RTC moved to dismiss for lack of jurisdiction contending the Plaintiff's failure to exhaust the administrative procedures as mandated by § 1821(d) deprived the court of jurisdiction.  Id.  The court granted the motion.  Id.

On appeal, the plaintiff argued, inter alia, that FIRREA did not mandate administrative review, FIRREA did not apply to pending actions, and RTC failed to comply with the statutory notice provisions.  Id. at 483-84.  As a matter of first impression, the Eighth Circuit agreed with other circuits having considered the issue that "[t]he language of the statute makes it clear that administrative exhaustion is required before any court acquires subject matter jurisdiction over a claim brought against the RTC as receiver for a failed banking institution."  Id. at 484 (agreeing with the conclusions reached by its sister circuits in Henderson v. Bank of New England, 986

F.2d 319 (9th Cir. 1993); Office and Prof'l Employees Int'l Union Local 2 v. FDIC, 962 F.2d 63, 66 (D.C. Cir. 1992); Meliezer v. RTC, 952 F.2d 879, 882 (5th Cir. 1992); RTC v. Elman, 949 F.2d 624, 627 (2d Cir. 1991); Rosa v. RTC, 938 F.2d 383, 391 (3d Cir. 1991)).  Noting that "the Supreme Court has consistently held that where Congress has imposed an administrative exhaustion requirement by statute, the exhaustion of those procedures is mandatory," and concluding "[t]he language of the statute makes it clear that administrative exhaustion is required before any court acquires subject matter jurisdiction over a claim brought against the RTC as receiver for a failed banking institution."  Id. at 484.

The Bueford court also rejected the plaintiff's contention that her claim was exempt from FIRREA because her case was pending at the time the receiver was appointed.  Id. at 485.  The court reasoned that § 1821(b)(6)(B) "provides that a claim which has not been presented to the RTC by the end of the statutory period shall be deemed disallowed, and no further appeal will be possible," and that it "specifically includes: 'an action commenced before the appointment of the receiver.'"  Id. (quoting § 1821(d)(6)(B)(ii)).  Thus, the court concluded that language "clearly indicate[d] that FIRREA is to be applied to pending actions."  Id.[8]

The court similarly rejected the plaintiff's challenge that the RTC had not complied with the notice requirement because the RTC sent the appointment of receivership letter to Bueford's attorney rather than to Bueford's "last address appearing in [the failed institution's] books" as instructed by the statute.  Id. at 486 (alteration in original) (quoting § 1821(d)(3)(C)(i)).  The court found the plaintiff's contention misguided, reasoning that while "notice is a critical factor

---

[8] Regarding the impact of pending litigation on the administrative exhaustion requirement, the Bueford court also found relevant subsections 1821(d)(5)(F)(ii) and (d)(6)(A), which state, respectively, that "the filing of a claim with the receiver shall not prejudice any right of the claimant to continue any action which was filed before the appointment of the receiver"; and that "[b]efore the end of the 60–day period . . . the claimant may request administrative review of the claim in accordance with [the statute] or file suit on such claim (*or continue an action commenced before the appointment of the receiver*).  Bueford, 991 F at 484 n.6 (alteration in original).

of the FIRREA statutory scheme," to which RTC must comply, "when the RTC knows that a claimant is represented by counsel with regard to a claim, and especially when litigation is pending, it is entirely proper for the RTC to notify the claimant of the receivership via her attorney," and that "to do otherwise might be an improper communication with a represented party, and could well be a breach of professional ethics." Id. at 486-87.

In the present case, the FDIC timely instituted the administrative process and moved to stay the proceeding. Plaintiff's contention that Bueford is not controlling because that court was considering a motion to dismiss for failure to exhaust administrative remedies and not a motion to stay is a distinction without substance. In determining the propriety of the district court's dismissal of plaintiff's case for failure to exhaust administrative procedure, the court first had to determine the proper procedure to be followed. Id. at 484-87. The plaintiff in Bueford raised the same challenges Plaintiff raises in the present case, thus, Bueford is controlling. The Court finds that the FDIC has followed the exact procedure proscribed in Bueford and staying this action is required.

## III.  CONCLUSION

For the reasons stated, Plaintiff's Motion to Remand, ECF No. 8, must be **denied**, and the FDIC's Motion to Stay, ECF No. 3, must be **granted**. This case is **stayed** until the earlier of: (1) the date on which the FDIC makes a final determination on Plaintiff's administrative claim, or (2) 180 days from the date Plaintiff filed her administrative claim. The parties shall inform the Court by written notification when one of those conditions has been satisfied.

**IT IS SO ORDERED.**

Dated this 16th day of October, 2014.

JAMES E. GRITZNER, Chief Judge
U.S. DISTRICT COURT

25